Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| D.S., and C.S.,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH.<br><br>Defendants. | COMPLAINT<br><br>Case No. 2:22-cv-00295 - CMR |

Plaintiffs D.S. and C.S., through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company and United Behavioral Health (collectively "United") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. D.S. and C.S. are natural persons residing in Wake County, North Carolina. D.S. is C.S.'s father.

2. United Healthcare Insurance Company is an insurance company headquartered in Hennepin County, Minnesota and was the insurer and claims administrator, as well as the

1

fiduciary under ERISA for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

3. United Behavioral Health is the mental health arm of United Healthcare Insurance Company and was the entity tasked with the processing and denial of C.S.'s residential treatment.

4. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). D.S. was a participant in the Plan and C.S. was a beneficiary of the Plan at all relevant times. D.S. and C.S. continue to be participants and beneficiaries of the Plan.

5. C.S. received medical care and treatment at Solacium Sunrise ("Sunrise") from February 5, 2020, to August 16, 2021. Sunrise is a residential treatment facility located in Washington County Utah, which provides sub-acute inpatient treatment to adolescent girls with mental health, behavioral, and/or substance abuse problems.

6. United denied claims for payment of C.S.'s medical expenses in connection with her treatment at Sunrise.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, the appeals and claims at issue in this case were processed in United's Salt Lake City facility, and the treatment at issue took place in Utah.

9. In addition, D.S. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which he will

be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### C.S.'s Developmental History and Medical Background

11. From a young age, C.S. was defiant of authority and often threw tantrums when she didn't get her way. She would take things that didn't belong to her and would refuse to follow directions. C.S. suffered from sensory issues and started receiving occupational therapy.

12. C.S. would hit her sister and stated that she wanted to die. D.S. became concerned about C.S.'s behavior and arranged for her to have a psychological evaluation. C.S. was diagnosed with Attention-deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and with problems related to her school environment.

13. C.S. started participating in a social skills group and receiving neurofeedback treatment but it did not help her improve. C.S. began meeting with a variety of different therapists, but similarly saw no improvement. Around the time that she was in the third grade, C.S.

received another psychological evaluation. In addition to her previous diagnoses, the evaluator opined that C.S. likely had a mood disorder and a non-verbal learning disability.

14. Around the time that she was in the sixth grade, C.S.'s school performance suffered significantly and she became increasingly depressed. C.S. started receiving treatment at a facility called the Brain Balance Achievement Center but her condition continued to deteriorate and she continued to express suicidal ideation.

15. At the end of her sixth grade year, C.S. was discovered to be self-harming by cutting. She would yell at and inflict physical harm on her siblings and threaten to kill them. C.S. again began meeting with a psychologist. C.S.'s psychologist recommended that her school put an individualized education plan in place, but her school was resistant and instead assigned her a teacher to act as a mentor.

16. In December of 2016, C.S. took a knife out of the kitchen and threatened to kill herself with it. D.S. took her to the emergency room and once she had stabilized, she began attending an intensive outpatient program for three weeks.

17. C.S.'s behavior continued to deteriorate and when D.S. attempted to impose consequences such as taking her phone away, she would smash doors and break into safes in order to get it back. C.S. would shoplift and also stole D.S.'s credit card and made over $1,000 in fraudulent purchases.

18. C.S. stopped doing her schoolwork and began refusing to go to school altogether. C.S.'s therapist recommended that she begin attending an outdoor behavioral health program and she was admitted to a facility called Trails Carolina on March 31, 2017. Following

her time at Trails she began attending a therapeutic boarding facility called Lake House Academy.

19. Following her discharge from Lake House Academy, C.S. resumed seeing a therapist and started attending a local private school, however she was expelled a few weeks later after she was caught giving one of her friends some Adderall. C.S. was also kicked out of a local church youth program because she was determined to be a safety risk.

20. C.S. started attending another private school, but she would steal laptops from the school and use them to contact strange boys. She continued struggling academically, shoplifting, destroying property, and even physically assaulted her mother. C.S.'s therapist recommended that she be enrolled in another therapeutic boarding school.

21. D.S. followed this advice, but C.S. often ran away from the program, stole items from others while in treatment, and threatened to self-harm. C.S. was allowed to go on a home visit but violated the terms of her behavior contract while there. When confronted about this, she became very aggressive and ran away from home.

22. C.S. returned home but then attempted suicide by overdosing on medications. She was found by her brothers unable to walk, shaking violently, vomiting, and with no control of her bladder. C.S. was rushed to the emergency room and then stayed at the psychiatric hospital from January 19, 2020, through January 28, 2020.

23. C.S. returned to her therapeutic boarding school but the next day she stole some items from a locked room, ran away, and threatened to hurt herself if she was forced to return. C.S. was then picked up by the sheriff's office and again received acute inpatient hospitalization.

24. As other levels of care including acute hospitalizations, therapeutic boarding schools, and outpatient care had failed to effectively address C.S.'s conditions she was admitted to Sunrise.

### Sunrise

25. C.S. was admitted to Sunrise on February 5, 2020.

26. In a letter dated March 25, 2020, United denied payment for C.S.'s treatment from March 20, 2020, forward, stating that:

    > We've denied the medical services requested by you or your provider for Mental Health Residential Treatment as of March 20, 2020.
    >
    > Your child is being treated for problems with her mood.
    >
    > Your child's request was reviewed. We reviewed your clinical case notes. We have denied the medical services requested.
    >
    > The criteria are not met because:
    > - Your child is stable on medications without any side effects.
    > - Your child is no longer reporting any thoughts or plans to harm herself.
    > - Your child no longer appears to require twenty-four (24) hour monitoring.
    > - Her challenge with feeling she cannot connect can be addressed with continued outpatient counseling.
    >
    > Care and recovery could continue in the Mental Health Outpatient setting.
    >
    > Please discuss these options with your child's provider.
    >
    > The Guideline/Policy/ Criteria used for this decision are:
    >
    > The American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 for Level 5 - Medically Monitored Residential Services, which is applicable to the Mental Health Residential Treatment Level of Care.
    >
    > If you want more information about the guidelines used for this decision, see:

       https://www.providerexpress.com/content/ope-provexpr/us/en/clinical-resources/guidelines-policies.html[1]

27. On September 3, 2020, D.S. submitted an appeal of the denial of payment for C.S.'s treatment. D.S. reminded United that he was entitled to certain protections during the review process. He stated that under ERISA United was required to conduct a full, fair, and thorough review which took into account all of the information he provided using appropriately qualified reviewers, which gave him the specific reasoning for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

28. D.S. also requested to be provided with a copy of all documentation related to the level one appeal determination as well as the initial decision, including any internal notes or reports utilized by the reviewers. D.S. stated that the CASII criteria recommended levels of care based on a composite subscore of six separate dimensions. He asked to be provided with these scores as well in order to better understand why United had elected to deny payment.

29. D.S. wrote that while United had not provided him with the criteria it used, he was able to obtain a copy through a third-party source. He contended that United had misapplied these criteria when it elected to deny care and that its denial also violated generally accepted standards of medical practice.

---

[1] Plaintiffs accessed this site shortly prior to the filing of this complaint. The page links to a long list of documents, the vast majority of which are in no way pertinent to United's denial. While it is possible that the referenced AACAP criteria are present on this site in some capacity, either hidden under a plethora of nested menus or in links to other pages, this link does not appear to contain, or at least does not provide easy access, to the referenced criteria.

30. He referenced the court decision in *Wit et.al., v. United Behavioral Health* in which United's proprietary criteria were found to violate generally accepted standards of medical practice on several counts, which he summarized as follows:

    (1) Overemphasizing acuity and crisis stabilization over effective treatment of the patient's underlying condition.
    (2) Failing to address the effective treatment of co-occurring conditions.
    (3) Failing to err on the side of caution in favor of a higher level of care when there is ambiguity and pushing patients to lower levels of care where such a transition is safe even if the lower level of care is likely to be less effective.
    (4) Precluding coverage for treatment to maintain level of function.
    (5) Precluding coverage based on lack of motivation.
    (6) Failing to address the unique needs of children and adolescents to receive intensive treatment over a sustained period of time.
    (7) Using an overly broad definition of "custodial care" along with overly narrow definitions of "active" treatment and "improvement," and
    (8) Imposing mandatory prerequisites rather than using a multidimensional approach.

31. D.S. stated that while United had retired the guidelines examined by the *Wit* court, it was evident from the denial letter that it was still relying on many of the same factors the *Wit* court had found to be impermissible when it denied C.S.'s treatment.

32. He contended that this was evident from United's stated reasons for denying care such as its assertion that C.S. was not at risk of harming herself. He stated that if she had been at risk of harming herself then the appropriate care environment would be an inpatient hospitalization setting, it would not be residential treatment.

33. He wrote that while the CASII criteria asked reviewers to interview the child and family and take into account clinical reports and the opinions of treating providers, United did not appear to have done this and it had disregarded the opinions of her treatment team who had treated her in multiple settings over several years.

34. He argued that C.S. needed care in a residential setting in order to be safely and effectively treated. He pointed out that when there was doubt as to which treatments were

8

likely to be effective, the CASII criteria instructed the reviewer to select the highest level of care that was likely to be safe and effective. He reminded United that it had not been safe to treat C.S. at the outpatient level for more than three years and stated that United's assertion that C.S. could now suddenly be treated at that level rang hollow and was like a "slap in the face."

35. He argued that United had misapplied its own criteria and that given the vagueness of the denial rationale, it was not apparent whether C.S. had been provided with a thorough review at all. He asked United to rely on the insurance policy's definition of medical necessity rather than proprietary criteria.

36. D.S. contended that United's denial constituted a non-quantitative treatment limitation in violation of MHPAEA. He stated that MHPAEA required insurers to ensure benefits for mental health services were administered at parity with analogous medical or surgical benefits. He identified skilled nursing and inpatient rehabilitation facilities as some of the medical or surgical analogues to the treatment C.S. received.

37. D.S. identified two specific non-quantitative treatment limitations United was applying in violation of MHPAEA. The first was requiring residential treatment services to meet specific requirements contained in proprietary criteria, while not only exempting analogous medical or surgical services from these requirements but having no specific criteria for these services at all.

38. The second example he gave of a non-quantitative treatment limitation was United's requirement of acute level conditions for the non-acute level of mental healthcare C.S. was receiving, such as its requirement that C.S. be at risk of harming herself or others, even though it imposed no such mandate for analogous medical or surgical services.

39. D.S. asked for a reviewer with experience in MHPAEA to review the appeal. He also requested that United perform a MHPAEA compliance analysis on the Plan and provide him with physical copies of the results of that analysis as well as physical copies of all documentation used.

40. D.S. included letters of medical necessity with the appeal. In a letter dated July 30, 2022, David Fitzgerald Ph.D., wrote in part:

> To assist the parents with finding appropriate educational settings, I suggested they consider consulting with a local professional familiar with the range of regional and national options for therapeutic and educational placements. Upon that consultation, [C.S.] began a wilderness camp and thereafter was enrolled in a therapeutic boarding school. I supported these placements as they offered [C.S.] the increased level of care and supervision her presentation required. I have not worked with her since those placements and have moved out of state for another position.
>
> Since that time, however, Mrs [S.] indicated when she requested this letter that [C.S.] was currently at Sunrise Residential Treatment in Utah upon failing placements at two previous therapeutic boarding schools. This series of outcomes is unfortunate, but consistent with the level of psychological and social maladjustment with which [C.S.] presented. My understanding for the reason for denial of coverage is the opinion that [C.S.] could be effectively treated in a less restrictive setting than a residential setting. In my opinion and based on her recent and past history, it appears that less restrictive levels of care have been attempted and have failed. I strongly urge you to reconsider this denial of coverage.

Gregory Narron, MD, wrote in part in a letter dated June 5, 2020:

> [C.S.] has significant processing issues that [were] revealed in her wide discrepancy of cognitive indices on her psychological testing. She was never officially diagnosed with a communication disorder but I highly suspect one at play. Despite multiple medication trials and a variety of behavioral interventions, ultimately … she began to escalate and could no longer be safely contained without more safeguards. Her level of impulsivity could not simply be explained by having ADHD and her level of entitlement could not be simply explained as a developing personality disorder, though I would not dispute either diagnosis. Despite her intelligence, she could not simply see the link between cause and effect. Despite various therapeutic approaches and different medication strategies, ultimately she could no longer be safely maintained in any placement less than a residential treatment center.

Annie Deming, Ph.D. wrote in part in a March 2020 psychological evaluation:

> It is recommended that [C.S.] continue in intensive residential treatment due to her long-standing anxiety and depressive symptoms, recent suicide attempt, and relational challenges. It is less likely that [C.S.] will make lasting changes outside of a structured environment. Once she completes the program at Sunrise a solid transition plan and a step down to another less intensive structured program will likely be necessary for her to make lasting changes and remain safe.

41. D.S. contended that all of the medical professionals who had treated C.S. in person agreed that treatment at the residential level was necessary and appropriate. He expressed his concern that United appeared to be disregarding the opinions of these clinical professionals who had worked with her on a firsthand basis and had actively witnessed the deterioration of her condition.

42. D.S. also included copies of C.S.'s medical records with the appeal. These records showed that C.S. continued to struggle with anxiety, theft, feelings of worthlessness, refusal to follow directions, depression, mood swings, an inability to maintain healthy relationships, bullying, and anger outbursts even while in the supportive and controlled environment of a residential treatment center.

43. D.S. asked in the event the denial was upheld that he be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any mental health criteria used to evaluate the claim, as well as their medical or surgical equivalents – regardless of whether these were used to evaluate the claim – as well as any reports or opinions concerning the claim from any physician or other professional who evaluated it, as well as their names, qualifications, and denial rates. (collectively the "Plan Documents")

44. D.S. directed United to forward his request to the appropriate entity if it did not possess these documents or if it was not acting on behalf of the Plan Administrator in this regard.

45. In a letter dated October 5, 2020, United upheld the denial of payment for C.S.'s treatment at Sunrise. The letter gave the following justification for the denial:

> As requested, I have completed an appeal/grievance review on a request we received 09/08/2020. This review included an examination of the following information: letter of the appeal request, claims records, case notes, Health Plan Certificate of Coverage. After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode [sic] I have determined that benefit coverage is not available for the following reason(s):
>
> Taking into consideration the available information, along with the locally available clinical services, it is my determination that the requested service did not meet the American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 Guidelines required to be followed in the member's behavioral health plan benefits.

46. The letter offered no further justification for denying payment and did not elaborate on which specific provision(s) of the AACAP Guidelines C.S. allegedly failed to meet.

47. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

48. The denial of benefits for C.S.'s treatment was a breach of contract and caused D.S. to incur medical expenses that should have been paid by the Plan in an amount totaling over $280,000.

49. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of D.S.'s request.

//

//

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

50. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

51. United and the Plan failed to provide coverage for C.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

52. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

53. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in D.S.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

54. D.S. provided United with clear and specific examples of the minimum rights he was entitled to under ERISA. He asked United to provide him with documents he was statutorily entitled to receive and expressed his interest in entering into a meaningful dialogue with United over the denial of C.S.'s care.

55. Although D.S. reminded United of its basic obligations under ERISA, United's October 5, 2020, denial letter gives no actual indication of why it elected to deny payment. United stated that C.S.'s treatment failed to meet guidelines but failed to provide even a single statement in support of this assertion and in fact did not even identify which of the guidelines C.S. allegedly failed to meet, in spite of the fact that D.S. clearly and explicitly requested any applicable records, statements, or other materials in his appeal.

56. United and the agents of the Plan breached their fiduciary duties to C.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in C.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of C.S.'s claims.

57. The actions of United and the Plan in failing to provide coverage for C.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

58. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

59. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

60. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

61. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

62. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

63. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for C.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

64. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement

15

for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

65. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

66. United and the Plan evaluated C.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

67. D.S. provided two specific examples of nonquantitative treatment limitations involving the disparate application of medical necessity criteria between medical/surgical and mental health treatment. The first was that United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that C.S. received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "Your child is no longer reporting any thoughts or plans to harm herself."

68. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that C.S. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

69. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-

acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

70. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

71. The second example of a nonquantitative treatment limitation D.S. provided was that United restricted the availability of C.S.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. D.S. argued that not only did United exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. D.S. requested to be provided with these criteria if they existed, but United ignored this request.

72. These two examples of non-quantitative treatment limitations are particularly salient as they comprise the primary if not sole justifications United offered for the denial of payment. As noted above, in the October 5, 2020, United gave no justification for the denial other than that C.S.'s treatment did not meet its criteria. United did this, despite the fact that D.S. argued at length that these criteria were problematic and directly violated MHPAEA.

73. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or

in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

74. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

75. In fact, despite D.S.'s request that United and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, United and the Plan have not provided D.S. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, United and the Plan have not provided D.S. with any information about the results of this analysis.

76. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

77. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for C.S.'s medically necessary treatment at Sunrise under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

//

//

//

//

3.  Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.  For such further relief as the Court deems just and proper.

DATED this 29th day of April, 2022.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Wake County, North Carolina